IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Bruce Kaylor, | : | |
| | : | Case No. 1:19-cv-999 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Denying Motions for Summary Judgment |
| Multi-Color Corporation, | : | |
| | : | |
| Defendant. | : | |

This matter is before the Court on Defendant's Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment. (Docs. 41, 42.) Plaintiff Bruce Kaylor alleges disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* against his former employer, Defendant Multi-Color Corporation. Kaylor now moves for partial summary judgment on his purported claim that Multi-Color failed to accommodate his disability. Multi-Color moves for summary judgment on Kaylor's claim that he was terminated because of his disability. For the reasons that follow, the Court will **DENY** both pending Motions.

I.    BACKGROUND

A.    **Factual History**[1]

Kaylor was first hired at Multi-Color in August 2000. At some point prior to the relevant events, Kaylor left employment at Multi-Color for about one year, and then he returned to Multi-Color. He worked in several positions over the years, including as a scheduler, a make-ready organizer, and as a printing press operator. He worked as a printing press operator for three or

---

[1] The relevant facts are derived in part from Plaintiff's Statement of Proposed Undisputed Facts (Doc. 42-1) and Defendant's Response (Doc. 53-2).

four years prior to his termination in April 2019.

Multi-Color utilized a progressive discipline program for quality control issues. (Doc. 48 at PageID 2654.) There were four levels of discipline: verbal warning, written warning, suspension, and termination. (*Id.* at PageID 2675, 2754.) The company looked back only twelve months when applying progressive discipline. (*Id.* at PageID 2654; Doc. 46 at PageID 2294, 2416.)

Kaylor suffered a stroke in December 2010. (Doc. 33-3 at PageID 1647.) When he went back to work in January 2011, he had problems with his memory including remembering his phone number and how to work the press machine. (Doc. 33 at PageID 1491.) He followed up with a physician. The fact that Kaylor suffered a stroke was well known by Multi-Color management. Multi-Color requested that he receive a fitness for duty evaluation before returning to work because Kaylor had trouble remembering how to do some operations of the press. Kaylor was cleared him to return to work on February 17, 2011. (*Id.*; Doc. 33-3 at PageID 1647.) The evaluation noted that he had suffered a loss of memory. (Doc. 33-3 at PageID 1647)

Kaylor worked primarily on press 6 during his years as a press operator at Multi-Color. He was transferred to work on press 22 beginning at some time between March 2017 and April 2018. Press 22 was a newer model than press 6, and it had a different set-up process and running process, different depth setups, and different gear-changing processes. Kaylor described working on press 22 as follows: "There was so much more on 22 to have to remember that I could not -- I just couldn't do it. I could never get into the repetition, so to speak." (Doc. 33 at PageID 1481.) Kaylor stated did not have similar problems on press 6 despite his memory problems. He explained that he "was familiar with the screen or keyboard, so to speak, and what buttons to push, what not to and things like that." (*Id.* at PageID 1426.) He further explained

that "I've done that so much that it was habit for me. It was memory." (*Id.* at PageID 1479–1480.)

Kaylor asked Rodney Toles, an interim supervisor, if he could be placed back on press 6, but he believed Toles wanted him to stay on press 22. Kaylor testified that he then told Joe Mummert, the plant manager, that he wanted to transfer "back to press 6 where [he was] comfortable." (*Id.* at PageID 1479.) He told Mummert in regard to press 22 that "I can't do this. I cannot remember things." (*Id.*) Mummert made the decision to put Kaylor back on press 6. Kaylor testified that Toles was "not happy with [him] leaving press 22." (*Id.* at PageID 1477.)

On May 10, 2018, Keith Hill, a supervisor, issued a written notice to Kaylor placing him on a "Performance Improvement Plan" (PIP) because his "performance as a press operator . . . [was] unacceptable." (Doc. 46 at PageID 2449.) The PIP set benchmarks for Kaylor to achieve on press 6, but it referenced his performance as an operator on press 22 in comparison to average operators on press 22. (*Id.* at PageID 2451–2452.) Kaylor testified that he asked to move back to press 6 after he was placed on the PIP. (Doc. 33 at PageID 1457.) He switched back to press 6 sometime around June 2018. (Doc. 33-2 at PageID 1609.) He was taken off the PIP in July 2018. (*Id.*)

On August 16, 2018, Kalylor was issued a written warning for a quality control incident which had occurred on June 14, 2018. (Doc. 33-2 at PageID 1610.) The written warning stated that the quality error caused 300,000 labels to be discarded resulting in a $2,913 sales loss. (*Id.*) It is not clear if the incident occurred when Kaylor was working on press 6 or press 22.

Also in August 2018, Kaylor had a second medical event, this time on the shop floor at Multi-Color. Kaylor was back to working on press 6 at the time of the incident. Kaylor experienced numbness and tingling in his arm, and he suspected he was suffering from another

3

stroke. A life squad responded and took him to the hospital. It was determined that Kaylor had heart palpitations, but he had not suffered a stroke. (Doc. 33 at PageID 1494–1496.)

On March 8 or 9, 2019, an internal quality error incident occurred for which Kaylor was ultimately suspended three days. (Doc. 33 at PageID 1470–1471; Doc. 33-2 at PageID 1611; Doc. 46 at PageID 2463.) The Disciplinary Action Form explained the incident as follows:

> Facts (to include details of incident, financial impact, etc.):
>
> Multi-Color Corporation is committed to providing our customers with superior products. It Is our expectation that you follow our strategic Quality Statement, PPOC's, work instructions, specifications, and provide a Quality product to our customer.
>
> Job Description: Tampax Radiant 18 Rgular PV
>
> Job Reference Number: #1070581
>
> Date of Incident: 3/9/2019
>
> Internal or External Quality Error: Internal
>
> Description of Incident:
>
> 10 master rolls (100,000 feet) were produced with yellow out of specification which resulted in the product not being suitable for shipment to the customer. It is the operator's responibilty to over see quality of printed labels in safe manner.
>
> This is your fourth quality incident in the past 12 months.
>
> Expected Results for Job Specific:
>
> Quality Alert= Color must be read on every roll produced. All colors must be printed out and they must have Delta E and L.A.B data. Special Instuctions =create a shingle sheet that includes one sample per roll.
>
> Any other violation of this policy may lead to further disciplinary action up to and including the termination of your employment.

(Doc. 33-2 at PageID 1611 (typographical errors not corrected).)[2]

---

[2] There are two versions of the Disciplinary Action Form in the record. One is dated 3/20/2019 and signed only by Kaylor. (Doc. 33-2 at PageID 1611.) The second is dated 4/2/2019 and signed by Kaylor, Toles, and a person from human resources. (Doc. 33-2 at PageID 1612.) Kaylor testified that he only signed one form. (Doc. 33 at PageID 1470.)

Kaylor testified that the print job #1070581 was already running when he started his job shift that day. (Doc. 33 at PageID 1462.) At some point, when he was conducting required quality checks, Kaylor discovered that a doctor blade on one of the colors was set incorrectly and made the color too dark. (*Id.* at PageID 1463.) He reported the error to his supervisor, reset the blade, and started the job again. (*Id.*) He did not dispute that 100,000 feet was produced with the color yellow out of specification. (*Id.*) Kaylor contends that he should not have been held liable for the error because the printing run was set before his shift: "I felt it was the supervisor's [Dan Reynolds's] fault from the second shift and the operator [Jeff McDaniel] who signed off on the job starting it up." (*Id.* at PageID 1464–1465.) He asserted that they should have checked the color standard when the print job was started. (*Id.* at PageID 1465.) He also testified that the press helper, who was Reynolds's son, should have been disciplined. (*Id.* at PageID 1468.) In fact, on March 28, 2019, Reynolds issued a written "verbal warning" Disciplinary Action Form to McDaniel for his role in the incident. (Doc. 47 at PageID 2492, 2605.)

Toles, the interim supervisor, initiated the disciplinary process against Kaylor. (Doc. 48 at PageID 2704–2705.) On March 12, 2019, after the incident but before the suspension was issued, Rob Tally, a human resources business partner, sent an email to Savanah Holmes, another human resources business partner, asking if she "was aware of any information about Bruce [Kaylor] having had stroke a few years back[.]" (Doc. 46 at PageID 2448.) Tally also stated that Toles "said Bruce has not been the same since his stroke a few years ago[.]" (*Id.*) Tally discussed this with Holmes while examining Kaylor's performance history and deciding whether to suspend him. (*Id.* at PageID 2331–2332.) When Holmes asked why Tally was sharing this medical information about Kaylor, Tally responded that "[Kaylor's] current performance is not to standard and Rodney [Toles] said 'he has not been the same since his stroke' so before we

5

suspend him I need to make sure Michelle [Piper-Wright] is aware of anything pertinent." (*Id.* at PageID 2445.) At his deposition, Tally said that he wanted Piper-Wright to be aware of the situation because he wanted to "mak[e] sure that the employee's welfare was okay." (*Id.* at PageID 2325.)

However, when Tally prepared an undated Suspension/Final Written Summary form—an internal form prepared to gather documentation prior to issuing discipline—he answered "No" to a question asking whether the company had "reason to believe that a medical condition . . . may be contributing to the associate's performance issues." (*Id.* at PageID 2463.) He also answered "No" to the question asking whether Kaylor "had requested any accommodation . . . in the past 6 months." (*Id.*)[3] On March 20, 2019, Multi-Color informed Kaylor that he was suspended for three days, a suspension which Kaylor served in early April 2019.

When Multi-Color informed Kaylor that he was being suspended, Kaylor testified that Toles said to him "I understand you have troubles" or "I know you have issues" during the meeting in which he was informed of his suspension. (Doc. 33 at PageID 1487.) Toles testified that Kaylor "acted out in an unprofessional manner" after he was suspended, cussing and saying he was going to sue the company. (Doc. 47 at PageID 2533–2534.) Kaylor denied that he made an outburst or said anything angrily. (Doc. 33 at PageID 1472.)

On April 8, 2019, Multi-Color prepared another Disciplinary Action Form against Kaylor for quality error incidents which had occurred on March 8, 2019 and October 24, 2018. (Doc. 33-2 at PageID 1613.) Toles had been asked to "gather data" on these incidents after Kaylor was suspended. (Doc. 47 at PageID 2542.) Toles testified that Multi-Color did not receive the complaints from its customers about the quality errors until after Kaylor had been suspended.

---

[3] Sonia Villines, the senior director of human resources, testified that an employee who stated that he could not operate a press because of a memory issue related to a stroke would be considered to have made a request for an accommodation. (Doc. 48 at PageID 2687.)

(*Id.* at PageID 2495–2496.)

Multi-Color terminated Kaylor effective April 10, 2019 during a telephone call with him as the result of this Disciplinary Action Form. (Doc. 33-2 at PageID 1614–1615.) Kaylor testified that he did not recall these newly-discovered incidents and so could not dispute whether the quality errors alleged had occurred. (Doc. 33 at PageID 1475.) Kaylor was age 59 at the time of his termination. (Doc. 53-1 at PageID 2871.)

Post-employment, Kaylor was evaluated by a licensed clinical psychologist on behalf of the Ohio Division of Disability Determination related to a claim for mental disability benefits. (Doc. 33-4 at PageID 1687–1695.) He was diagnosed with mild vascular neurocognitive disorder and anxiety in the August 19, 2019 report. (*Id.* at PageID 1693.) The psychologist stated as follows:

> He demonstrated particular weaknesses with regard to working memory and processing speed. The results of the current administration of the WMS-IV revealed deficits with regard to auditory memory, visual working memory, immediate memory, and delayed memory. He appears to experience mild to mostly moderate neurocognitive decline.

(*Id.*) She further stated that Kaylor was "likely to learn and process new information more slowly than his peers and to have difficulty maintaining an adequate work pace, especially with regard to complex, multi-step tasks." (*Id.* at PageID 1694.)

Kaylor's testimony appears consistent with this finding. He testified about his memory problems as of June 2019 as follows:

> I couldn't remember things. So I couldn't remember two or three things. I had trouble remembering, without using the GPS, to get to places or get back. My memory is altered quite a bit.

(Doc. 33 at PageID 1502.) He further stated that he could not remember what items to purchase at the store, the time for appointments, and measurements he has taken. (*Id.* at 1503–1504, 1506.)

7

**B.     Procedural History**

Kaylor filed a Charge of Discrimination with the EEOC on October 2, 2019. (Doc. 53-1 at PageID 2871–2873.) He alleged disability and age discrimination. (Doc. 53-1 at PageID 2871.) As part of his recitation of the facts, he asserted that his "cognitive problems led to him asking to be taken off work on a more complicated press machine which he had difficulty operating, and Multi-Color transferred him to a different press machine." (*Id.*) He alleged that Multi-Color terminated him "because of cognitive issues resulting from his stroke, [and] that Multi-Color believed him to be disabled due to these problems . . . ." (*Id.* at PageID 2873.)

On October 3, 2019, Kaylor then initiated this action by filing a Complaint in the Clermont County, Ohio Court of Common Pleas. (Doc. 2.) He filed an Amended Complaint on October 22, 2019. (Doc. 3.) Kaylor asserted claims for workers compensation retaliation, age discrimination, and disability discrimination in violation of the Americans with Disabilities Act in the Amended Complaint. (Doc. 3.) Multi-Color then removed the case to federal court. (Doc. 1.) Upon motion, Judge Matthew W. McFarland remanded the workers compensation claim to state court on September 21, 2020. (Doc. 10.) Later, after discovery, the parties stipulated to the dismissal of Kaylor's age discrimination claims. (Doc. 59.)

Only the disability discrimination claim remains. Kaylor alleged that Multi-Color terminated his employment on the basis of his actual or perceived disability. (Doc. 3 at 48–49.) He states that the proffered reason for his termination was pretextual and that the position stayed open or he was replaced by a non-disabled person after his termination. (*Id.* at PageID 49.)

Both parties have moved for summary judgment on Kaylor's ADA claim. Kaylor moves for summary judgment to the extent that he asserts that Multi-Color failed to accommodate his actual or perceived disability before terminating his employment. Multi-Color disputes that

8

Kaylor properly asserted a failure to accommodate claim, and it moves for summary judgment on the discriminatory discharge claim. The case was transferred three times: in January 2020, in December 2022, and then to the docket of the Undersigned Judge on April 12, 2024.

## II. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–587 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir.

9

2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

"Where the parties have filed cross-motions for summary judgment, the court must consider each motion separately on its merits, since each party, as a movant for summary judgment, bears the burden to establish both the nonexistence of genuine issues of material fact and that party's entitlement to judgment as a matter of law." *In re Morgeson,* 371 B.R. 798, 800–801 (B.A.P. 6th Cir. 2007).

### III. ANALYSIS

#### A. Overview of the Americans with Disabilities Act

The ADA, as amended, provides that "no covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In amending the ADA, Congress provided that the term "disability" should be "construed in favor of broad coverage . . . to the maximum extent permitted by the [ADA's] terms." 42 U.S.C. § 12102(4)(A); *see also Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 445 (6th Cir. 2018) (quoting the statute). "Congress also cautioned that 'the question of whether an individual's impairment is a disability . . . should not demand extensive analysis.'" *Barlia*, 721 F. App'x at 445 (quoting ADAAA § 2(b)(5)).

The ADA defines the term "disability" to mean:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment . . . .

42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "To determine whether a disability substantially limits major life activities, the regulations direct courts to compare the person claiming a disability to 'most people in the general population.'" *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018) (quoting 29 C.F.R. § 1630.2(j)(1)(ii).) "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii).

**B.**     **Plaintiff's Motion for Partial Summary Judgment—Failure to Accommodate**

Kaylor moves for summary judgment on his purported failure to accommodate claim under the ADA. Before the Court need analyze the merits of this purported claim, the Court must address Multi-Color's argument that Kaylor did not plead a claim for failure to accommodate at all. There is no dispute that the ADA bars the failure to accommodate a disability as unlawful discrimination. Discrimination is defined to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). A wrongful termination claim, however, can be analytically distinct from a failure to accommodate claim. *See Phipps v.*

11

*Accredo Health Grp., Inc.*, No. 2:15-cv-02101, 2016 U.S. Dist. LEXIS 79734, at *56–57 (W.D. Tenn. June 20, 2016) (explaining that an EEOC charge for discriminatory discharge does not administratively exhaust a failure to accommodate claim); *Stone v. Premier Ortho. & Sports Med.*, No. 3:12-00762, 2015 U.S. Dist. Lexis 96973, at *29 (M.D. Tenn. July 23, 2015) (same).

In this case, Kaylor asserted a claim for wrongful termination only, not for failure to accommodate. He alleged in the administrative Charge of Discrimination that Multi-Color terminated him "because of his cognitive issues resulting from his stroke, [and] that Multi-Color believed him to be disabled due to these problems." (Doc. 53-1 at PageID 2873.) Likewise, in the Amended Complaint, Kaylor alleged that Multi-Color terminated his employment on the basis of his actual or perceived disability, and that its reasons to the contrary were pretextual. (Doc. 3 at 48–49.) To the extent that Kaylor asserted facts about needing a reasonable accommodation, Kaylor pleaded that Multi-Color had accommodated the only request he made—the transfer from the more-complicated press 22 back to more-familiar press 6. (Doc. 3 at PageID 42; Doc. 53-1 at PageID 2871.) Multi-Color was not put on notice that it had to defend against a failure to accommodate claim when Kaylor pleaded that Multi-Color had granted the only accommodation request he made.

Kaylor cites *Blanchet v. Charter Communications, LLC*, 27 F.4th 1221 (6th Cir. 2022), for the proposition that a plaintiff is not required to plead a failure to accommodate claim separate from a disability discrimination claim premised upon a wrongful termination. However, Kaylor is reading the case too broadly, and *Blanchet* is factually distinguishable. In *Blanchet*, the plaintiff alleged that she suffered disability discrimination because she was terminated during a period of medical leave she had taken because of her disability of postpartum depression. *Id.* at 1225–1227. The defendant employer had concluded that her final request for additional leave

was not a *reasonable* request for further accommodation. *Id.* One holding of the case was that the direct-evidence test for proving discrimination claims applied because all failure to accommodate claims are direct evidence claims. *Id.* at 1227. The defendant argued that the plaintiff had not pleaded a failure to accommodate claim, but the court found the plaintiff had "alleged facts *premised* upon an employer's failure to accommodate." *Id.* (citations omitted). The plaintiff's claim that she was terminated during an approved leave was effectively a claim that the employer had not granted her the accommodation. The request for medical leave as an accommodation and the termination of her employment were inextricably intertwined.

The same is not true in Kaylor's case. Kaylor conceded that Multi-Color granted his only request for accommodation in mid-2018 by transferring him away from press 22 and back to press 6. His termination several months later did not vitiate the fact that Multi-Color granted him that reasonable accommodation. He did not allege that he needed or requested further accommodation. Instead, he pleaded that Multi-Color wrongfully terminated him on pretextual grounds because he was disabled or regarded as disabled. The Court will deny partial summary judgment to Kaylor because he did not plead a failure to accommodate claim separate from the discriminatory discharge claim.

C.      **Defendant's Motion for Summary Judgment—Discriminatory Discharge**

Multi-Color moves for summary judgment on Kaylor's claim for discriminatory discharge in violation of the ADA. Multi-Color first and primarily argues that Kaylor cannot establish as a matter of law that he had an actual disability, had a record of a disability, or was regarded as disabled. Because the Court finds that there is sufficient evidence that Multi-Color regarded Kaylor to be disabled to create a genuine dispute of material fact, the Court will not grant summary judgment on this basis.

13

The ADA provides that a person is regarded as having a disability if the individual establishes that "he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). "[I]t is not enough that the employer is simply aware of a plaintiff's symptoms; rather the plaintiff must show that the employer regarded the individual as 'impaired' within the meaning of the ADA." *Neely v. Benchmark Fam. Servs.*, 640 F. App'x 429, 435–436 (6th Cir. 2016). There is sufficient evidence in this case to create a genuine dispute of material fact as to whether Multi-Color regarded Kaylor to be disabled.

There is no dispute that Multi-Color management knew he had suffered a stroke in 2011. There is also evidence suggesting that they believed Kaylor suffered memory and thinking impairments that affected his job performance even years after his stroke. Brett Sigrist, a supervisor, said that Kaylor was both "known at the shop as someone who had regular quality issues" and known as "someone who had health issues." (Doc. 45 at PageID 2100–2101.) Mummert, the plant manager, approved Kaylor's transfer away from press 22 and back to press 6 after Kaylor told him that press 22 was too complex for him to learn to operate. (Doc. 33 at PageID 1479.) Toles, the interim supervisor who initiated the decision to suspend Kaylor, testified that Kaylor would sometimes lose focus while operating the press and that he would become aggravated when he could not "understand something or couldn't fit something on the press." (Doc. 46 at PageID 2462; Doc. 47 at PageID 2492–2493, 2521–2522.) Most significantly, two HR business partners discussed in emails about Kaylor's possible suspension that his stroke might be affecting his job performance. Tally stated to Holmes that Kaylor's "current performance is not to standard and Rodney [Toles] said 'he has not been the same since

14

his stroke.'" (Doc. 46 at Page 2445.) Multi-Color will be able to present evidence in opposition to a finding that company officials regarded Kaylor as disabled, such as Toles's testimony that he believed Kaylor was qualified to operate press 6. Nonetheless, there is sufficient evidence for a reasonable jury to conclude that Multi-Color regarded Kaylor as disabled. *See Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 321 (6th Cir. 2019) (finding sufficient evidence existed to prove defendants regarded the plaintiff as disabled when defendants discussed their concern about the plaintiff's eye condition at his termination evaluation meeting and discussed needing to consult an attorney).[4]

Multi-Color also moves for summary judgment on the basis that Kaylor cannot prove as a matter of law that he was terminated because of his disability. The Court disagrees. A plaintiff can prove he was terminated because of his disability with direct evidence or with evidence that the employer knew he was disabled and that he was replaced by or treated differently than a non-disabled and similarly-situated employee. *See Babb*, 942 F.3d at 319–320 (setting out the prima facie case). Kaylor presents such circumstantial evidence here. Toles, the interim supervisor, testified that Reynolds, the shift supervisor, should have been disciplined, but was not disciplined, for the same March 2019 incident for which Kaylor received his three-day suspension. (Doc. 47 at PageID 2513.) Reynolds had signed off on the incorrect setting of the press blade for the color yellow. (*Id.*) Also, although Toles testified that he did not think that Kaylor was directly replaced, he also stated that Multi-Color had hired several press operators since Kaylor was terminated. (Doc. 47 at PageID 2485, 2488–2489.)

---

[4] To the extent that Multi-Color argues that Kaylor's actual or "regarded as" disability did not substantially impair his major life activities of thinking or working as a matter of law, that argument fails. A plaintiff need not prove that a "regarded as" disability limits or is perceived to limit a major life activity. 42 U.S.C. § 12102(3)(A); *see also Babb.*, 942 F.3d at 318–319 (discussing statute); *Baum v. Metro Restoration Servs., Inc.*, 764 F. App'x 543, 547 (6th Cir. 2019) (stating that in a "regarded as" claim, the plaintiff need not prove the limitation of a major life activity). Multi-Color's reliance on case law interpreting the original version of the ADA, before it was amended, is unavailing.

Likewise, Sonia Villines, the senior human resources director, testified that Jeff McDaniel, who received only a verbal warning for the March 2019 incident for which Kaylor was suspended, had a record of seven quality control errors in the year prior the incident. (Doc. 48 at PageID 2662, 2748.) He did not receive discipline for any of the previous errors. (Doc. 45 at PageID 2123, 2126.) These facts create a genuine dispute whether Multi-Color treated McDaniel more favorably than Kaylor. Villines also testified that Kaylor was directly replaced by Joe Blanton. (Doc. 48 at PageID 2707.)[5]

The Court can quickly dispose of the remaining *McDonnell-Douglas* burden-shifting analysis. Multi-Color asserted that it terminated Kaylor for non-discriminatory reasons, including his purported quality errors and possibly his alleged outburst after his suspension. However, there is sufficient evidence of pretext to create a genuine dispute of fact, including that (1) Multi-Color looked for and found additional quality control errors by Kaylor which had occurred prior to the suspension incident and used those to justify his termination; (2) Kaylor's regular supervisor, Sigrist, did not participate in the decision to suspend him for the March 2019 quality control error; (3) Kaylor testified that Toles, the interim supervisor, mentioned his "troubles" or "issues" when they discussed his suspension; and (4) Multi-Color did not attempt to determine whether Kaylor needed further accommodation to operate press 6 despite his alleged repeated quality errors after transferring back from press 22.[6] Multi-Color did not

---

[5] Although Kaylor does not present direct evidence that the other employees discussed were not disabled, Villines testified that no other employee (as of January 2022) had requested an accommodation after demonstrating a disability. (Doc. 48 at PageID 2685.) Also, Multi-Color did not attempt in the Reply brief to refute Kaylor's assertion that these employees were treated more favorably.

[6] In the context of a discriminatory discharge case, the Sixth Circuit instructed that "failure to consider the possibility of reasonable accommodation for known disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities." *Equal Emp. Opportunity Comm'n v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018) (quotation omitted). In *Dolgencorp*, the plaintiff had requested an exception to a company policy forbidding eating on the job as an accommodation and then was fired for drinking juice during a diabetic incident in violation of that policy. *Id.*

address the pretext argument or attempt to refute this evidence in its Reply brief. In sum, the Court finds that Kaylor has presented sufficient evidence that Multi-Color terminated him because of his disability in violation of the ADA to warrant proceeding to trial. The Court will deny summary judgment to Multi-Color.

## IV. CONCLUSION

Defendant's Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment are both **DENIED**. (Docs. 41, 42.) The parties will proceed to trial on Kaylor's claim that Multi-Color wrongfully terminated him in violation of the ADA.

**IT IS SO ORDERED.**

BY THE COURT:

S/Susan J. Dlott
Susan J. Dlott
United States District Judge